## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

RONNIE LEE SANDERS,

        Plaintiff,

vs.

JAMES MCKINNEY, KAREN
ANDERSON, JANA HACKER,
KRISTINE WEITZELL, TONY COMP,
VICKI HARTLEY, KRISTINE PETERS,
ANGIE SCHWERING, MICHELLE
ENGELBRECHT, JENNY
RUTHERFORD,

        Defendants.

No. C12-3029-MWB

*REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT*

———————————————

### TABLE OF CONTENTS

I.    **INTRODUCTION**..................................................................... 2

II.   **RELEVANT FACTS** ............................................................... 2

III.  **SUMMARY JUDGMENT STANDARDS** ............................. 10

IV.  **ANALYSIS** ............................................................................. 11
     A.   *Were Defendants Deliberately Indifferent to a Serious Medical Need?* ................................................................................ 12
     B.   *Are Sanders's Claims Barred by 42 U.S.C. § 1997e(a)?*................. 16
     C.   *Are Sanders's Claims Barred by 42 U.S.C. § 1997e(e)?*................. 19
     D.   *Has Sanders Stated a Factual Basis for Claims Against Defendants Weitzell and Comp?* ............................................... 19
     E.   *Can McKinney Be Held Liable Based on Respondeat Superior?*........ 21
     F.   *Should Sanders's Claims Against Anderson, McKinney and Weitzell Be Dismissed?* ..................................................... 22
     G.   *Are Defendants Entitled to Qualified Immunity?*........................... 23

V.   **CONCLUSION AND RECOMMENDATION**....................................... 25

# I.   INTRODUCTION

Plaintiff Ronnie Lee Sanders, an inmate in Iowa's state prison system, commenced this lawsuit on April 9, 2012.  He then filed a *pro se*[1] complaint on August 27, 2012.   Sanders alleges the defendants have been deliberately indifferent to his medical condition which involves the presence of blood in his stools.  Sanders has been experiencing this condition off and on for over two years while an inmate at the Fort Dodge Correctional Facility (FDCF).  He seeks compensatory damages in the amount of $10,000 and an order directing that he be allowed to see a medical specialist for diagnosis and treatment.   The ten named defendants are individuals who were associated with the Iowa Department of Corrections (DOC) during the relevant period of time.

Defendants have filed an answer in which they deny Sanders's claim.  No party has demanded a jury trial.  Defendants have now moved for summary judgment.  (Doc. No. 27).   Sanders has filed a resistance (Doc. No. 34) and defendants have filed a reply.  (Doc. No. 35).  Judge Bennett has referred the motion to me for the preparation of a report and recommended disposition.  No party has requested oral argument and, in any event, I find that oral argument is not necessary.  *See* N.D. Ia. L.R. 7(c).  The motion is fully submitted.

# II.   RELEVANT FACTS

Unless otherwise noted, the following facts are undisputed for purposes of defendants' motion:

***The Parties.***   Sanders has been an inmate in the Iowa prison system since December 2, 2008.  He has been incarcerated at FDCF since July 21, 2009.  At all relevant times: (a) defendant James McKinney was the Warden of FDCF, (b) defendant Kristine Weitzell was Assistant Deputy Director for the Iowa Department of

---

[1] Sanders's motion to appoint counsel was granted on March 15, 2013.  Doc. No. 19.

Corrections in Des Moines, Iowa, (c) defendant Tony Comp was a Unit Manager at FDCF, (d) defendant Jana Hacker was a nurse practitioner at FDCF, (e) defendant Karen Anderson was a nursing supervisor at FDCF and (f) defendants Vicki Hartley, Kristin Peters, Angie Schwering, Michelle Engelbrecht, and Jenny Rutherford were all nurses at FDCF.

*Sanders's Treatment History.*  Sanders has a history of hemorrhoids and constipation.  He had surgery for hemorrhoids in 2005.  Beginning on December 7, 2009, Sanders sought medical care at FDCF relating to blood in his stools.  A doctor performed a rectal exam and found one external hemorrhoid.  He prescribed psyllium fiber, a bulk-forming laxative.  On April 19, 2010, Sanders complained of continuing problems with hemorrhoids and stated he was not using the fiber very often because it gave him diarrhea.  A rectal exam revealed no abnormalities and he was prescribed a hydrocortisone suppository.  Sanders reported to health services again on June 11, 2010, stating there was a lot of blood in the toilet following a bowel movement.  He saw a doctor on June 14.  A rectal exam revealed no abnormalities.  The doctor prescribed acetaminophen and issued three hemoccult cards, which are used to test for the presence of blood in a person's stool.

On July 12, 2010, Sanders complained of cramps before and after a bowel movement and again stated there was blood in his stool.  He was diagnosed with constipation and instructed to increase fluids as tolerated, exercise as tolerated, keep a daily food and stool diary and try to avoid irritating foods.  He was scheduled to see a doctor three days later.  The doctor gave Sanders hemoccult cards which he was to return to health services for lab testing.  Sanders was seen again in health services for blood in his stool on August 2, 6, 22 and 24.  He was treated with a hemorrhoid suppository.  A doctor performed a physical exam on August 6 which revealed no abnormalities.

On August 26, a doctor diagnosed Sanders with an anal fissure and prescribed nitroglycerin ointment.  Sanders met with a different doctor for a follow up on

September 22 and on December 20 he again saw the doctor who had diagnosed the anal fissure. Sanders saw a doctor on January 13, 2011, and his nitroglycerin prescription was renewed.

On January 25, 2011, Sanders complained to health services of excessive gas. He stated he had foul-smelling gas every day and the anti-gas pill he purchased from the commissary did not help. He also stated he had only been using the nitroglycerin ointment when necessary because it made him sick. He was seen by a doctor two days later. The doctor performed a rectal exam which was noted to be normal and prescribed anti-gas medication. These medications were refilled on February 22 and April 18.

On June 3, 2011, Sanders again complained of blood in his stool. He was seen by a doctor on June 6, who performed a rectal exam which revealed no abnormalities. A complete blood count was ordered which came back normal. On June 25, Sanders saw Peters and asked for his Tylenol prescription to be refilled, which had expired on January 20, 2011. Peters told him he could purchase various pain relievers, including Tylenol, from the commissary. On June 27, Sanders asked Hartley for his Tylenol medication to be refilled stating he had no income. Hartley told Sanders that the doctor would not renew medications that were available for purchase from the commissary and the records revealed he had money that could be used to purchase items from the commissary.[2] Medication for hemorrhoids and gas was refilled in July and September. In October, Sanders requested a refill of his psyllium prescription from Peters. Hacker, who had recently been hired as the primary provider for FDCF, approved the renewed prescription, but Schwering instructed Sanders he would need to purchase it

---

[2] In her deposition, Hacker testified that physicians would often prescribe over-the-counter medications on a short-term basis, but the inmate was encouraged to purchase the medication from the commissary if it was available and the inmate had funds and needed it on a longer-term basis in accordance with DOC Policy Number HSP407.

from the commissary in the future.[3]  He was also instructed by Peters to purchase any anti-gas medication from the commissary because it would not be refilled.

On October 20, 2011, Sanders complained to Anderson that he was tired of being told to purchase his own medical items from the commissary.  He was educated on changes he could make to his diet and exercise that could help with his constipation.  Anderson also reviewed the medication options that were available at the commissary.  On December 2, Sanders again requested a refill of psyllium from Hartley.  She informed him that Hacker said he needed to purchase it from the commissary.

On December 8, 2011, Sanders filed an emergency grievance concerning blood in his stools.  Anderson and Engelbrecht observed his rectal area on December 9 and noted there was no blood or external hemorrhoids.  Sanders was given three hemoccult cards and told that he would be referred to a doctor if any of them came back positive.  Two days later, Sanders reported to health services again stating he had had blood in his stools for the past five days and wanted to see a doctor because he was worried something was wrong.  He also wanted his gas medication refilled because of abdominal pain and discomfort.  Two of his hemoccult cards were positive for blood and he was referred to Hacker on December 13.  Hacker performed a rectal exam.  A hemoccult came back negative and she did not observe any frank blood or bleeding from the rectum.  She issued additional hemoccult cards and scheduled a follow up in two weeks.

On December 23, Sanders reported to Rutherford that his problem was currently not that bad.  He stated he wanted to see a specialist though because he thought the problem was different than hemorrhoids, which he had had in the past.  Rutherford instructed him to drink plenty of water and avoid straining during bowel movements.  She issued a hemoccult card.  On December 24, Sanders returned the card, which was

---

[3] Hacker began working at FDCF in July 2011.  Doc. No. 34-3 at 25.  She replaced Dr. Ed Miller who last saw Sanders in August 2010.  Doc. No. 27-3 at 28.  In the interim, doctors from other prisons would come to FDCF as needed.  Doc. No. 34-3 at 20.

positive for blood. An appointment was scheduled with Hacker. The nurse also reviewed his commissary purchases and noted that he had not purchased any hemorrhoid cream or psyllium.

On December 27, Hacker performed a rectal exam and noted no abnormalities.[4] A hemoccult was negative and a complete blood count was ordered, which came back normal. He was seen again on December 28 after Sanders had Comp observe blood in his stool and Comp told Sanders to report to health services. Engelbrecht and another nurse checked his rectal area. They did not observe any rectal bleeding or external hemorrhoids.

At a follow-up exam with Hacker on January 5, 2012, Sanders refused an abdominal exam or rectal exam for a hemoccult. He told Hacker that he noticed he would have blood in his stools on days when he experienced excessive gas. Hacker told Sanders to report to health services when he needed to have a bowel movement so it could be assessed for blood. He reported to health services to have a bowel movement on January 6 and 8 with no blood in the stool. Hacker instructed the nurses to have Sanders defecate into a urine hat with an officer present in the bathroom so they could confirm there was no blood in the stool before Sanders flushed it. On January 12 Sanders went to health services for a bowel movement which did not have blood in it. He admitted he had not purchased Metamucil from the commissary as recommended because he did not think he should have to pay for his medication. On January 16, Sanders reported to health services for a bowel movement, which was positive for blood. He was diagnosed with constipation and prescribed a stool softener.

---

[4] Hacker stated in her deposition that she could not recall whether Sanders had told her he wanted to see a specialist. Nurse Anderson testified during her deposition that she knew Sanders wanted to see a specialist, but she could not make the decision to refer him to one. According to her, in order to see a specialist Hacker had to refer the inmate to the DOC referral committee. That committee meets with practitioners from other institutions and they review cases to determine if an inmate should see a specialist or if further treatment can be completed at the facility.

On February 1, Sanders again complained of blood in his stool. Hacker was notified and on February 6 she performed a physical examination and prescribed a hydrocortisone suppository. When he reported continued bleeding later that month, Hacker prescribed hemorrhoid medication and refilled his stool softener. Hacker testified in her deposition that she did not believe Sanders had a more serious medical condition beyond hemorrhoids or an anal fissure because he did not have any weight loss, there was no change in his appetite, he had no abdominal pain or frank bleeding and nothing on the hemoccult suggested anything beyond hemorrhoids.

*The Grievance Process.* Sanders attempted an informal resolution of his grievance concerning his medical treatment with Anderson, the inmate patient advocate and grievance officer. He submitted a written request for interview/assistance on October 19, 2011. Doc. No. 34-3 at 51. He wrote that he considered it the DOC's responsibility to provide for all his medical needs including paying for his medication. Sanders then filed a standard grievance complaining of denial of health care and medication on October 20 (First Grievance). He stated health services had denied him proper medical treatment by instructing him to purchase psyllium from the commissary rather than prescribing it to him. He also described his medical condition stating his bowel movements were painful and his hemorrhoids were getting worse and bleeding more often.

Sanders filed an appeal to the warden on November 18, 2011, indicating his grievance had not been answered. He stated that Comp had told him on November 11 that his grievance had been delivered to Anderson. Sanders again stated he should not have to purchase his own medication and he had been refused medical treatment.

On December 8, Sanders filed a grievance appeal to Deputy Director Kristine Weitzell at the central office stating he had not received a response from Warden McKinney. In this appeal, Sanders complained of the health care he was receiving at FDCF and stated he wanted his medications to be continued and to see a specialist.

Sanders filed an emergency grievance that same day concerning blood in his stools (Second Grievance).

Anderson responded to the Second Grievance on December 13, 2011, noting that it was assigned number 10485 and would be processed as a standard grievance. She wrote, "Inmate is currently under care for his blood in his stools. Inmate has been instructed to purchase Psyllium from canteen." Doc. No. 27-3 at 123. If Sanders wished to appeal, the warden/superintendent or designee had to receive the appropriate completed form within 15 days. That same day, Sanders received a response from Weitzell informing him that he had not followed the proper grievance procedure for his First Grievance and had to file it with the warden before filing it with the central office.

On December 20, Sanders wrote to Weitzell explaining why he thought he had followed the proper grievance procedure. He referenced materials he had attached in his appeal to her in which he stated:

> On 11-18-11 seven days after unit manager Comp told me he had passed my grievance on to Karen Anderson I still had not received any response to the grievance so as per policy I proceeded to the next step and sent an appeal to Warden McKinney in a sealed inner institution envelope which on the same date I placed in the institutional mailbox. The policy on appeals is as follows word for word. The Warden/Superintendent or designee shall respond in writing using the grievance appeal response form in ICON grievance to the appeal within 15 days of receipt. The appeal response shall include the reasons for the decision.
>
> Today is the 28th day since I filed my appeal to Warden McKinney with no response so I am by policy taking the next step by appealing to you, Regional Deputy Director Kristine Weitzell.

Doc. No. 34-3 at 63-64. On December 22, Weitzell responded, "You will need to follow grievance procedure and file an appeal to the Warden." *Id.* at 73.

On December 23, 2011, McKinney provided a response[5] stating, "Sir, when an individual has the funds necessary and the medicine required to assist in your healing is available through canteen, you are required to purchase your own material." Doc. No. 27-3 at 134. It also contained a notice that to appeal the warden's response, the appeal had to be received by the regional deputy director's office within 15 days.

On December 28, Sanders again wrote to Weitzell accusing her of failing to follow the proper grievance procedure. He stated he intended to file a lawsuit for this violation and the refusal of medical care, medications and treatment for his existing serious medical condition. *Id.* at 76. Weitzell responded to this letter on January 5, 2012. She stated Sanders's letter was unclear as to whether he was referring to grievance 10485 or bringing up a new issue. She noted Anderson had answered grievance 10485 on December 13, 2011, and McKinney had responded to it on December 23, 2011. She stated that Sanders needed to use the appeal form if he was appealing grievance 10485 or follow the grievance process at the institutional level if he was raising a new issue. Sanders did not appeal his Second Grievance to Weitzell.

Sanders initiated his case in this court on April 9, 2012. Doc. No. 1. He brings his claim pursuant to 42 U.S.C. § 1983 and alleges that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. His complaint contains a detailed account of his medical condition regarding the presence of blood in his stools and his medical treatment at FDCF. Sanders requests compensatory damages in the amount of $10,000, an order directing that he be allowed to see a medical specialist for diagnosis and treatment and any other relief the court finds appropriate.

---

[5] It is not clear whether McKinney was responding to the First or Second Grievance. The response indicated it concerned grievance number 10485 (the Second Grievance), but the record only contains an appeal of the First Grievance to the warden.

### III.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id*.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 248-49.  The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at

323).  Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial.  *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005).  The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law.  If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587-88.  Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts.  *Id.*  However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis*, *Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).  Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## IV.   ANALYSIS

Defendants raise seven separate arguments in seeking entry of summary judgment:

a.  Defendants were not deliberately indifferent to a serious medical need

b.  Sanders's claims are barred by 42 U.S.C. § 1997e(a)

c.  Sanders's claims are barred by 42 U.S.C. § 1997e(e)

d.  Sanders has not stated a factual basis for claims against defendants Weitzell and Comp

e.      Defendant McKinney cannot be held liable based on respondeat superior

f.      Sanders's claims against Anderson, McKinney and Weitzell must be dismissed as there is no constitutional right to have a grievance resolved to plaintiff's satisfaction

g.      Defendants are entitled to qualified immunity

## A.    *Were Defendants Deliberately Indifferent to a Serious Medical Need?*

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban against cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To prevail on such a claim, an inmate must show "that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the first requirement, an objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991)). Under the second requirement, an official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Id.* "Deliberate indifference is equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d at 914-15 (quoting *Farmer*, 511 U.S. at 835, 839-40).

With regard to the first requirement, Sanders alleges that the presence of blood in his stools for over two years demonstrates an objectively serious medical need. Defendants do not dispute this, but disagree with Sanders's suggestion that his condition is anything other than hemorrhoids. Because both parties agree that blood in Sanders's

stools constitutes a serious medical need that requires treatment (regardless of the cause or diagnosis), I find that the evidence is sufficient to support a finding that Sanders meets the first requirement.

The second requirement is subjective, meaning that Sanders must put forth evidence demonstrating a factual issue as to whether defendants acted with a "sufficiently culpable state of mind, namely, that they actually knew of, but deliberately disregarded [Sanders's] medical needs." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (internal citations and quotations omitted). The evidence must show "that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Id.* (emphasis in original). To put it another way, deliberate indifference occurs when an official "knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Schaub*, 638 F.3d at 916 (citing *Farmer*, 511 U.S. at 847).

Sanders alleges that the defendants acted recklessly in response to his serious medical need by failing to refer him to a specialist when his symptoms persisted for two years despite treatment. Sanders requested to see a specialist because he was worried that his symptoms of bloody stools and excessive gas were indicative of a more serious medical condition than hemorrhoids. Defendants argue that Sanders's disagreement with the course of medical treatment is an insufficient basis to establish a constitutional violation. *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (dismissing inmate's deliberate indifference claim where inmate alleged he suffered from kidney stones but multiple medical tests revealed no such condition). They contend there is no evidence to suggest they provided improper or untimely treatment for Sanders's condition that would constitute deliberate indifference.

Hacker is the only defendant[6] who was part of the medical staff and who had authority to recommend that Sanders see a specialist. Doc. No. 34-3 at 17. Anderson testified in her deposition that if the practitioner thought an inmate needed to be seen by a specialist, she would present his case to the DOC referral committee, which was made up of practitioners from other institutions. They would review cases and determine whether the inmate needed to be seen and, if so, where. Hacker testified that blood in a person's stool could be caused by many things such as hemorrhoids, fissures, gastritis, ulcers in the colon and possibly tumors or pretumor cells in the colon. Doc. No. 34-3 at 29. She stated that a diagnosis of potential cancerous cells in the colon was outside her scope of practice. She could not recall whether Sanders had spoken to her about seeing a specialist or having a colonoscopy to determine if something other than hemorrhoids was causing his symptoms. This request was noted in Sanders's medical records. Hacker did not believe Sanders's symptoms indicated a more serious condition because he had a known diagnosis of hemorrhoids and had no other complaints such as weight loss, change of appetite, abdominal pain, frank bleeding or hemoccult emesis. *Id.*

Sanders was treated for hemorrhoids, constipation and an anal fissure. He was issued numerous hemoccult cards which came back with both positive and negative results. Lab work was also ordered which came back normal. Medical staff, including doctors from other institutions and Hacker, performed several rectal exams which revealed no abnormalities beyond hemorrhoids and an anal fissure. Sanders was prescribed psyllium, hydrocortisone suppositories, hemorrhoid cream, nitroglycerin ointment, stool softener, anti-gas medication and Tylenol. Pursuant to Iowa DOC policy, Sanders was instructed to purchase any items that were available over-the-

---

[6] The other defendants' potential liability for this claim is discussed *infra* in Parts D, E and F. This section only addresses liability for defendants involved in Sanders' medical treatment including Anderson, Hacker, Hartley, Peters, Schwering, Engelbrecht and Rutherford (the medical staff defendants).

counter and in the commissary when his prescriptions ran out. He was also advised of dietary and exercise changes he could make that could help relieve his symptoms.

The evidence in this record is simply insufficient to generate a genuine issue of material fact as to whether Hacker, or any of the other defendants, acted or failed to act with the requisite culpable state of mind. There is simply no evidence to support a finding that they "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Krout*, 583 F.3d at 567. Although such knowledge can be demonstrated through circumstantial evidence where, for instance, the medical need is so obvious that a reasonable person would know that the inmate needed medical attention, Sanders's evidence fails to allow this inference.

"Where a doctor faces symptoms that could suggest either indigestion or stomach cancer, and the doctor mistakenly treats indigestion, the doctor's culpable state of mind is not established even if the doctor's medical judgment may have been objectively unreasonable." *Self v. Crum*, 439 F.3d 1227, 1234 (10th Cir. 2006). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. " *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Here, the undisputed evidence shows that Hacker and the other defendants were fully aware of Sanders's symptoms. Sanders has presented no evidence from any medical source indicating that it was negligent, let alone reckless, for Hacker and the other defendants to proceed as they did in response to those symptoms. For example, he has produced no evidence that it is abnormal for a patient with a known diagnosis and history of hemorrhoids to experience blood in his stool off and on for two years. Nor is there evidence of other symptoms or signs that should have alerted Hacker or the other defendants that Sanders needed to be seen by a specialist.

There is also no evidence that Sanders was ever denied medical treatment. He was never turned away, he was often referred to a doctor or Hacker, multiple exams and tests were performed with normal results and Sanders was prescribed or

recommended medication for his symptoms.  Although he may have disagreed with this treatment, "a showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso v. Lawrence Cnty.*, 452 F.3d 978, 983 (8th Cir. 2006) (internal quotations and brackets omitted).  Simply put, the record does not contain sufficient evidence to suggest that defendants "actually knew of and disregarded a substantial risk of serious harm to [Sanders's] health or safety." *Farmer*, 511 U.S. at 844.

Sanders's concerns about possibly having a more-serious condition, while understandable, amount to nothing more than the unsupported second-guessing of judgments made by medical professionals.  Because Sanders has produced no competent medical opinion evidence supporting his concerns, this court would have to engage in its own unsupported second-guessing in order for Sanders to prevail.  Based on this record, Sanders has not demonstrated a genuine issue of material fact as to whether the medical staff defendants were deliberately indifferent to a serious medical need.  I recommend entry of judgment in these defendants' favor as a matter of law.

This recommendation, if adopted, would likely dispose of the entire case.  Nonetheless, and in the alternative, I will address the defendants' other summary judgment arguments.

**B.      Are Sanders's Claims Barred by 42 U.S.C. § 1997e(a)?**

Section 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  If a claim is not exhausted, the district court must dismiss it. *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

Defendants argue that Sanders failed to exhaust his administrative remedies because he did not follow the proper grievance procedure for his complaints. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements . . . that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). The Eighth Circuit has excused inmates from complying with grievance procedures when "officials have prevented prisoners from utilizing the procedures, . . . or when officials themselves have failed to comply with the grievance procedures." *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005).

The grievance policy of the Iowa DOC at the relevant time required inmates to attempt an informal resolution of the grievance before filing a written grievance. The inmate then had to file a grievance complaint using a form. Only one issue could be raised per form. Within seven days, the grievance officer would notify the inmate of receipt of the grievance and the process to be used (standard, emergency, non-grievable or other). Within 21 days of receiving the grievance, the grievance officer would provide a written response and recommendation or otherwise notify the inmate that the investigation was continuing. If the inmate wished to appeal that decision, he was required to complete a form. This appeal form had to be received by the warden/superintendent within 15 days of the grievance officer's response. The warden/superintendent would respond in writing within 15 days. If the inmate was still not satisfied with the response, he then had to submit an appeal form to the regional deputy director. The form had to be received within 15 days of the warden/superintendent's response. The regional deputy director would then respond within 30 days, which constituted the final appeal step.

Defendants contend that Sanders did not appeal his grievance properly because he sent an appeal to Weitzell, the regional deputy director, prior to receiving an answer from McKinney, the warden. When he was advised by Weitzell to follow the proper grievance procedure, Sanders failed to do so because he did not file an appeal to

Weitzell after he did receive a response from McKinney. Sanders argues he properly followed the grievance procedure for his First Grievance which he explained in his letter to Weitzell on December 20.

The record indicates Sanders's First Grievance from October 20 was not answered or given a grievance number. When Sanders did not receive a response from Anderson, the grievance officer, he appealed to McKinney. When he did not receive a response from McKinney, he appealed to Weitzell. Sanders's Second Grievance on December 8 was given a grievance number and responded to by Anderson. This grievance contained the same issue as the first. McKinney provided a response on December 23, although there is nothing in the record indicating that Sanders ever filed an appeal for the Second Grievance. Sanders had filed an appeal to McKinney concerning his First Grievance when he did not receive a response from Anderson. Sanders had then appealed to Weitzell when he did not receive a response from McKinney within the required time frame. Sanders explained this in a letter to Weitzell on December 20 after she denied his appeal stating he had not followed the proper grievance procedure.

Viewing these facts in the light most favorable to Sanders, I find that Sanders made a good faith effort to comply with the grievance procedure and exhaust his administrative remedies. Obviously some miscommunication developed concerning his First and Second Grievance, but this does not appear to be entirely Sanders's fault. It is easy to understand how Sanders would be confused about his obligations in the grievance process when his First Grievance was never answered on its initial filing or appeal, but a Second Grievance was responded to by the warden even though it had never been appealed to him. Because Sanders attempted to clarify these issues with Weitzell and she was aware of Sanders's grievance, I do not recommend entry of summary judgment against Sanders based on 42 U.S.C. § 1997e(a).

## C.    Are Sanders's Claims Barred by 42 U.S.C. § 1997e(e)?

Section 1997e(e) provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18).

Defendants argue Sanders's claim for compensatory damages is barred by this statute because he has not demonstrated a physical injury as a result of defendants' actions. Sanders argues he has shown physical injury due to defendants' alleged lack of medical care because blood in his stools is indicative of an injured condition whether hemorrhoids or something else.

Section 1997e(e) limits the available damages in the absence of a physical injury but does not preclude a plaintiff from pursuing a claim. *See Royal v. Kautzky*, 375 F.3d 720, 723-24 (8th Cir. 2004). A plaintiff may still seek nominal damages, punitive damages and injunctive and declaratory relief in the absence of a physical injury. *Id.*

Sanders seeks compensatory damages and injunctive relief. The issue of whether he has adequately demonstrated a physical injury as a result of defendants' alleged deliberate indifference need not be addressed at this time because he seeks relief other than compensatory damages. I do not recommend entry of summary judgment against Sanders based on 42 U.S.C. § 1997e(e).

## D.    Has Sanders Stated a Factual Basis for Claims Against Defendants Weitzell and Comp?

Defendants argue Weitzell and Comp should be dismissed from the suit because Sanders does not have a factual basis for a claim against them. Sanders has alleged that he notified Weitzell of his medical condition and dissatisfaction with the medical treatment he was receiving through his attempted appeals and letters to her. He has

also alleged that Comp was aware of his condition as he personally observed blood in Sanders's stools.

The Eighth Circuit has stated that "a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." *Camberos*, 73 F.3d at 176. Moreover, those officials who lack medical expertise "cannot be liable for the medical's staff's diagnostic decision not to refer [the inmate] to a doctor." *Id.* (citing *Crooks v. Nix*, 872 F.2d 800, 803 (1989)). "Supervisors can, however, 'incur liability . . . for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices.'" *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993)).

While Sanders has set forth sufficient evidence that Weitzell and Comp had knowledge of his medical condition, he has failed to set forth any evidence that could suggest their actions or inactions amounted to deliberate indifference. The evidence shows that Comp observed blood in Sanders's stool and sent him to health services. As Comp is not a medical professional, he could not have been expected to do anything more. Sanders has failed to provide a sufficient factual basis for a deliberate indifference claim against Comp. Therefore, I recommend that summary judgment be entered in his favor.

As for Weitzell, the evidence shows that Sanders sent multiple attempted appeals and letters to her complaining of his medical condition and treatment. Weitzell responded to these appeals and letters by telling Sanders he had not followed the proper grievance procedure and advising him how to comply. There is nothing in the evidence to suggest that Weitzell knew that Sanders faced a substantial risk of serious harm and "disregard[ed] that risk by failing to take reasonable measure to abate it." *Farmer*, 511 U.S. at 847. Instead, the evidence shows that Weitzell was aware that Sanders was being treated for his condition by health services and she advised him in her letter of

December 29, 2011, to follow their instructions. The evidence fails to show that Sanders's treatment was so plainly deficient that Weitzell, as a non-medical professional, can be held liable for deferring to the medical staff's treatment decisions. *See Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals."). Weitzell simply instructed Sanders to follow the proper grievance procedure and the directions of health services. This is an insufficient factual basis to support a finding that Weitzell was deliberately indifferent to a serious medical need. I recommend that summary judgment be entered in Weitzell's favor.

### E.      Can McKinney Be Held Liable Based on Respondeat Superior?

"[S]upervisors are not liable for [E]ighth [A]mendment claims brought under section 1983 on a respondeat superior theory." *Choate*, 7 F.3d at 1376 (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)). Supervisors can only be liable based on (a) their personal involvement in a constitutional violation or (b) when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices. *Id.* (citations and quotations omitted). "The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye [to it]." *Meloy*, 302 F.3d at 849.

McKinney cannot be held liable under the theory of respondeat superior nor under either of the acceptable theories noted above. As with Weitzell and Comp, McKinney's "general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability."

*Camberos*, 73 F.3d at 176. While McKinney had notice of Sanders's symptoms, he is also a non-medical professional and generally cannot be personally liable for medical staff's treatment decisions. *Webb v. Hedrick*, 409 Fed. Appx. 33, 36 (8th Cir. 2010). Because he was not personally involved with Sanders's treatment, he can only be held liable if he had "a reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating) [Sanders]." *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008).

Sanders has not put forth any evidence suggesting that McKinney had knowledge that Sanders was not being treated properly for his symptoms. Because there is insufficient evidence to demonstrate a genuine issue of material fact as to whether McKinney was deliberately indifferent to Sanders's serious medical need, I recommend entry of judgment in his favor as a matter of law.

### F.      Should Sanders's Claims Against Anderson, McKinney and Weitzell Be Dismissed?

Defendants argue that Sanders's claims against Anderson, McKinney and Weitzell must be dismissed because Sanders does not have a constitutional right to have his grievance resolved to his satisfaction. They contend that Sanders has included these defendants in his complaint due to his disagreement with the responses they provided in the grievance process, which is an insufficient cause of action.

I have already determined that these defendants are entitled to summary judgment on Sanders's claim of deliberate indifference. To the extent Sanders's complaint can be read as alleging a due process violation for these defendants' failure to properly address his grievances, I agree with defendants that this is not a sufficient cause of action. *See Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (stating that inmates do not have a federally protected liberty interest in having their grievances resolved to their satisfaction); *see also Wilson v. Vannatta*, 291 F. Supp.2d 811, 819 (N.D. Ind. 2003) ("The right to petition the government for grievances does not

guarantee a favorable response, or indeed any response, from government officials.").
I recommend that any alleged due process violation relating to defendants' failure to
comply with the grievance procedure be considered dismissed for failing to state a
claim upon which relief may be granted.

### G.    *Are Defendants Entitled to Qualified Immunity?*

Finally, defendants argue Sanders's claim must be dismissed because they are
entitled to qualified immunity. Qualified immunity protects public officials "from
liability for civil damages insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person would have known."
*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine balances (a) the need to
hold public officials accountable when they exercise power irresponsibly with (b) the
need to shield officials from harassment, distraction and liability when they perform
their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Officials
are not liable for bad guesses in gray areas; they are liable for transgressing bright
lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (citation and internal
quotation marks omitted).

Qualified immunity is "an immunity from suit rather than a mere defense to
liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). The analysis consists of two
inquiries:

> 1.    Do the facts alleged or shown make out a violation of a
> constitutional right?
>
> 2.    Was that right clearly established (from the perspective of a
> reasonable official in the defendant's position) at the time of
> the alleged conduct?

*Pearson,* 555 U.S. at 232; *see also Irving v. Dormire,* 519 F.3d 441, 446 (8th Cir.
2008). A public official is entitled to qualified immunity unless the answer to both
questions is "yes." *Pearson,* 555 U.S. at 232. While federal courts were once

required to address these two inquiries sequentially, they are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Thus, when appropriate, a court may skip the first inquiry and find that qualified immunity exists based on a finding that the alleged constitutional right was not "clearly established" at the time of the alleged conduct. *Id.*

I have already determined that Sanders has failed to demonstrate a genuine issue of material fact as to whether defendants were deliberately indifferent to a serious medical need. Even if defendants had been deliberately indifferent in violation of the Eighth Amendment, Sanders would have to show that the alleged right he is claiming was clearly established at the time of the alleged conduct. Whether a right is "'clearly established' is a question of law for the court to decide." *Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009). "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The relevant question "is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Rohrbough*, 586 F.3d at 586 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Sanders, of course, has a clearly-established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment. However, qualified immunity will apply only if it would have been clear to a reasonable officer that the actions or inactions Sanders complained of were unlawful under the circumstances. This does not necessarily mean that the precise actions had to have been declared unlawful by prior court decisions. *See, e.g., Atkinson v. City of Mountain View*, 709 F.3d 1201, 1212 (citing *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001)). It does mean, however, that prior decisions must have provided "fair warning" that the

actions were unconstitutional. *Id.* (citing *Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002)).

Sanders claims that he had a right to see a specialist for diagnosis and treatment of his medical condition. Courts have found that failure to send an inmate to a specialist can amount to deliberate indifference where "the need for . . . referral to a medical specialist is obvious." *See Self*, 439 F.3d at 1227 (stating, as an example, where a doctor knows that the patient needs delicate hand surgery requiring a specialist but performs the operation himself). The evidence here does not establish an obvious need for a specialist. Sanders has a known history and diagnosis of hemorrhoids and no symptoms or test results suggested that Sanders's condition could be something more serious that would require a specialist's expertise. Even if it could be determined that failure to send Sanders to a specialist amounted to deliberate indifference, the right to see a specialist under these circumstances was not so clearly established that a reasonable officer would know he or she was acting unlawfully by failing to arrange that appointment. *See Davis*, 375 F.3d at 712 ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").

Sanders's claim fails both prongs of the qualified immunity analysis. This provides an alternative basis for me to recommend that defendants' motion for summary judgment be granted.

## V. CONCLUSION AND RECOMMENDATION

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the defendants' motion for summary judgment (Doc. No. 27) be **granted**, that this case be **dismissed with prejudice** and that **judgment be entered** in favor of the defendants and against the plaintiff.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the

service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **IT IS SO ORDERED.**

      **DATED** this 17th day of December, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE